UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAKOTA FOUNDRY, INC., | * | CIV 11-1026-RAL |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | OPINION AND ORDER |
| | * | DENYING MOTION TO COMPEL |
| TROMLEY INDUSTRIAL HOLDINGS, | * | ARBITRATION |
| INC., | * | |
| | * | |
| Defendant. | * | |

Plaintiff Dakota Foundry, Inc., sued Defendant Tromley Industrial Holdings, Inc. ("Tromley"), claiming breach of contract, breach of express and implied warranties, and negligence related to equipment that Tromley delivered for Dakota Foundry. Tromley filed a motion to compel arbitration or, in the alternative, to dismiss. Doc. 9. In an Order and Opinion, Judge Charles B. Kornmann, to whom the case was assigned at the time, denied Tromley's motion and determined there to be questions of fact concerning whether arbitration should be compelled. Doc. 19. Judge Kornmann later reassigned the case to the undersigned judge. Doc. 29.

On May 25, 2012, this Court held an evidentiary hearing on the fact questions concerning Tromley's Motion to Compel Arbitration. At the hearing, the parties jointly submitted the testimony of Warren Wilson by deposition, presented testimony from Doug Valsvig, Dale Oakvik, and Terry Sampson, and introduced certain exhibits. Each party was allowed to supplement the record thereafter and both parties did so. Doc. 43; Doc. 45. For the reasons explained in this Opinion and Order, this Court now denies Tromley's Motion to Compel Arbitration and concludes that no arbitration provision governs the dispute between these parties.

1

## I. Findings of Fact Relevant to Arbitration Provision

Dakota Foundry is an iron foundry located in Webster, South Dakota. Doc. 37. Dakota Foundry, among other things, melts scrap iron into molten iron, pours the molten iron into sand molds, and sells the resulting cast iron parts. Ct. Trial Tr. 11-12, May 25, 2012 (hereinafter "Ct. Trial Tr.").[1] Dakota Foundry has forty-three employees, sells its products primarily in the Upper Midwest and in Canada, and has been in operation since December of 2004. Ct. Trial Tr. 11-12.

Tromley is an Oregon business, that among other things, is the parent company of Kloster Foundry Products ("Kloster"). Doc. 11-1. Kloster, during the time relevant to this matter, was based in the Twin Cities area and sold foundry equipment.

The dispute in this case centers on certain equipment purchased by Dakota Foundry from the Kloster division of Tromley. Doug Valsvig, the vice president and controller of Dakota Foundry, contacted Warren Wilson, a sales representative of the Kloster division of Tromley, in the Fall of 2009 about Dakota Foundry's interest in replacing a sand mixer and related equipment. Ct. Trial Tr. 113, 15-17; Wilson Dep. 6-8, May 8, 2012 (hereinafter "Wilson Dep.").[2] The practice at the Kloster division of Tromley at the time was for Wilson to collect information from potential customers and to provide that information to Wilson's co-employee Dale Oakvik, the operations manager for Kloster. Ct. Trial Tr. 86, 89; Wilson Dep. 9. Oakvik had as his practice to prepare an original quote "on cream-colored stationery of Kloster, the reverse side of which had the standard terms and conditions." Ct. Trial Tr. 92. The Standard Terms and Conditions of Sale used by Kloster had a binding arbitration clause. Ct. Trial Tr. 92. Oakvik then would

---

[1]This Opinion and Order uses "Court Trial Tr." followed by a page reference to refer to testimony in the transcript of the evidentiary hearing held on May 25, 2012.

[2]This Opinion and Order uses "Wilson Dep." followed by a page reference to refer to testimony in the transcript of the Warren Wilson deposition held on May 8, 2012.

make additional "working copies" of the quote, copying just the face of the cream-colored stationery. Ct. Trial Tr. 92. These working copies would not have the Standard Terms and Conditions of Sale because only the face of the cream-colored stationery would be copied. Ct. Trial Tr. 92. Oakvik would provide both the original quote to Wilson–sometimes in a plastic binder with the original quote having the Standard Terms and Conditions of Sale on the reverse side of the cream-colored stationery–as well as the additional working copies. Ct. Trial Tr. 90-95. Oakvik would not handle the delivery of the quote package to the potential customer; Wilson would. Ct. Trial Tr. 95.

In December of 2009, Wilson delivered to Valsvig two quotations. First, he delivered quotation number KFP-01228-1 for phase one of a proposed sale and installation of Kloster equipment to Dakota Foundry. Ct. Trial Tr. 18, 55-56; Ex. 32. Second, Wilson provided quotation number KFP-01248 for phase two involving the sale and installation of other equipment. Ct. Trial Tr. 55-56; Ex. 33. Valsvig, whom this Court heard testify live and found to be credible regarding issues concerning the existence of an arbitration provision, retained the quotations that he received from Wilson in December of 2009. Ex. 32; Ex. 33; Ct. Trial Tr. 55-56, 80-81. Valsvig made personal notes on his copy of the quotes during his discussion with Wilson in December of 2009 regarding the equipment. Ex. 32; Ex. 33; Ct. Trial Tr. 55-56, 80-81. Those quotes that Valsvig received from Wilson in December of 2009, and on which Valsvig made his notes, were not on cream-colored stationery and did not contain on the reverse side of the quotation the Standard Terms and Conditions of Sale. Ex. 32; Ex. 33; Ct. Trial Tr. 55-56, 80-81. Both quotation KFP-01228-1 and quotation KFP-01248 contained "NOTES," which stated in part:

> **Standard Terms and Conditions of Sale**
> Please pay particular attention to the attached copy of our Standard Terms and Conditions of Sale which are an integral part of this quotation.

Ex. 32; Ex. 33. There were no Standard Terms and Conditions of Sale attached to the quotes received by Valsvig and Dakota Foundry in December of 2009. Ex. 32; Ex. 33. There were, however, "STANDARD

PAYMENT TERMS" contained in each of the sets of quotations from December of 2009. Ex. 32; Ex. 33. Valsvig testified that he thought the "NOTES" referring to Standard Terms and Conditions of Sale meant the "STANDARD PAYMENT TERMS" Ct. Trial Tr. 83.

Wilson testified that he was unsure whether he ever received from Oakvik an original of the quotations that he delivered to Dakota Foundry in December of 2009. Wilson Dep. 12-14. Tromley presented no evidence that Wilson actually delivered original quotations on cream-colored paper in December of 2009 to Dakota Foundry, and thus provided no evidence that Dakota Foundry received the Standard Terms and Conditions of Sale, containing the arbitration provision, in December of 2009.

On February 24, 2010, Dakota Foundry issued a single purchase order to Tromley in a total amount of $564,500, to cover both the phase one quote KFP-01228-1 and the phase two quote KFP-01248. Ex. 3. The purchase order did not reference any terms and conditions of the sale. Ex. 3.

Tromley, through its Kloster division, issued an invoice dated February 24, 2010, to cover the sale and installation of equipment in both phase one and phase two in the amount of $564,500. Ex. 4. This invoice did not contain terms and conditions of the sale. Ex. 4. On March 18, 2010, the Kloster division of Tromley issued an invoice to Dakota Foundry for a forty percent down payment in the amount of $225,800. Ex. 5. The invoice did not contain any terms and conditions of sale. Ex. 4. Dakota Foundry paid $225,815 by wire transfer on March 19, 2010. Ex. 35; Ex. 36.

On April 19, 2010, Tromley issued another quotation, KFP-01228-2, which stated that it was a "revised quotation" and had "combined quotes KFP-01228-1 [and] KFP-01248-1 and all subsequent changes made during our meetings into one, cohesive system quote." Ex. 6. This quote contained the same "NOTES" advising Dakota Foundry "Please pay particular attention to the attached copy of our Standard Terms and Conditions of Sale which are an integral part of this quotation." Ex. 6. The parties dispute

4

whether Tromley's Standard Terms and Conditions of Sale were attached to or provided with the April 19, 2010 quote. Tromley's then-employee Wilson testified by deposition, rather than live before this Court. Wilson's recollection was that he hand-delivered the April 19, 2010 quote to Doug Valsvig at Dakota Foundry in Webster, South Dakota. Wilson Dep. 29. Wilson remembers discussion internally at Kloster about providing Dakota Foundry with a "premium folder," which he believed would have contained the cream-colored stationery, with the Standard Terms and Conditions of Sale printed on the back side. Wilson Dep. 29-31. Wilson testified that he recalled delivering the April 19, 2010 quote in person in Webster, because he received a speeding ticket on the way back from delivering the quote to Kloster in Brown County for over $100. Wilson Dep. 62-63. Wilson did not say, and was not asked whether the ticket was from Brown County, South Dakota or Brown County, Minnesota. Regardless, Wilson is mistaken as there is no record of any speeding ticket that he received in either Brown County, South Dakota, Ex. 41, or Brown County, Minnesota. Ex. 41; Ex. 40. Moreover, Brown County, South Dakota is to the west of Webster, and not on the route that Wilson would have taken from Webster back to Kloster. And Brown County, Minnesota, likewise, is not on the way between Webster and Kloster's office. Because he testified by deposition, this Court did not have a full opportunity to gauge the credibility of Wilson, although he appears to have a mistaken recollection about a speeding ticket on a trip to Dakota Foundry in Webster.

Valsvig, whom this Court observed in person and found credible in the testimony that he gave during the evidentiary hearing, testified that he was unsure whether the April 19, 2010 quote was provided by email or in person. Ct. Trial Tr. 68. However, Valsvig testified with certainty that Dakota Foundry did not get the April 19, 2010 quote on cream-colored paper or in a manner in which the Standard Terms and Conditions of Sale were included. Ct. Trial Tr. 69-71.

Both parties agree that the Standard Terms and Conditions of Sale were never discussed in the

5

context of the quotes. Ct. Trial Tr. 23-25, 55-57; Wilson Dep. 37-39.  Wilson was unaware that there was even an arbitration provision in the Standard Terms and Conditions of Sale.  Wilson Dep. 39.  Dakota Foundry does not have any standard terms and conditions that it uses in its purchases and sales. Ct. Trial Tr. 66.  Although perhaps somewhat naive, Valsvig, in explaining that he thought reference in the "NOTES" to the Standard Terms and Conditions of Sale to be the same as the "<u>STANDARD PAYMENT TERMS</u>," gave credible testimony.

On May 25, 2010, the Kloster division of Tromley sent an invoice to Dakota Foundry for $225,800 for an additional forty percent of the total as a progress payment consistent with the "<u>STANDARD PAYMENT TERMS</u>." Ex. 7.  Dakota Foundry paid this amount on May 26, 2010, by wire transfer. Ex. 37.  Thus, by May 26, 2010, Dakota Foundry had paid eighty percent of the purchase price.  Dakota Foundry made another payment of $84,690 by wire transfer on July 1, 2010. Ex. 38.

Dakota Foundry brought this lawsuit after becoming dissatisfied with the Kloster equipment and operation of the equipment purchased from Tromley. Doc. 1.  Tromley answered, raising a defense that there was a binding arbitration clause based on the Standard Terms and Conditions of Sale. Doc 9.  Dakota Foundry then scoured its files to determine whether it had received such Standard Terms and Conditions of Sale.  Ct. Trial Tr. 48-51.  Dakota Foundry found no such Standard Terms and Conditions of Sale accompanying any of the quotations or invoices at issue. Ct. Trial Tr. 48-51.  Dakota Foundry did find that it had received on June 7, 2010, an email from Oakvik containing an addendum to quotation KFP-01228, entitled KFP-01228-2 Addendum. Ex. 13.  This addendum outlined specification changes to the equipment Dakota Foundry had ordered and added new equipment to the order to accommodate those changes. Ex. 13.  Attached to the addendum was a document entitled "DEPENDABLE FOUNDRY EQUIPMENT COMPANY REDFORD-CARVER FOUNDRY PRODUCTS COMPANY STANDARD TERMS AND

CONDITIONS OF SALE." Ex. 13; Ct. Trial Tr. 50-53. The standard terms and conditions within Exhibit 13 refer to two companies—Dependable Foundry Equipment Company and Redford-Carver Foundry Products Company—with which Dakota Foundry had no business. Dakota Foundry was acquiring its equipment from the Kloster division of Tromley, not from either of the two other businesses. Dependable Foundry Equipment Company and Redford-Carver Foundry Products Company are owned by Tromley and are sister companies to Kloster, and the terms and conditions used by those companies appear to be nearly identical to the Standard Terms and Conditions of Sale used by Kloster. The addendum also contained the provision stating "**NOTES:** This addendum is bound by the same Terms & Conditions as contained in the original quotation." Ex. 13. Dakota Foundry responded to this email on June 11, 2010, and accepted the modifications and new equipment. Ex. 14.

Dakota Foundry received a substantially similar addendum from Tromley dated June 10, 2010, entitled KFP-01228-2 Addendum 2. Like the previous addendum dated June 7, 2010, Addendum 2 adds equipment to the order and states that "This addendum is bound by the same Terms & Conditions as contained in the original quotation." Ex. 14. It is unclear whether a document entitled "DEPENDABLE FOUNDRY EQUIPMENT COMPANY REDFORD-CARVER FOUNDRY PRODUCTS COMPANY STANDARD TERMS AND CONDITIONS OF SALE" was included with this addendum. Ex. 14. Dakota Foundry agreed to the June 10 changes in a signed email sent from Dakota Foundry to the Kloster Division of Tromley. Ex. 14.

Dakota Foundry received emails substantially similar to the June 7 email on June 23 and July 6 that each contained a document entitled "DEPENDABLE FOUNDRY EQUIPMENT COMPANY REDFORD-CARVER FOUNDRY PRODUCTS COMPANY STANDARD TERMS AND CONDITIONS OF SALE." Ex. 15; Ex. 16. Dakota Foundry did not believe the terms and conditions attached to the June 7 addendum,

7

possibly attached to the June 10 addendum, and attached to both the June 23 and July 6 emails to apply and thought that they had been attached by accident by Tromley. Ct. Trial Tr. 41-43, 48, 63-64.   At the time of these email messages, Dakota Foundry had paid eighty percent of the purchase price. Ct. Trial Tr. 62.

Dakota Foundry also found that it had received in May of 2010 a transmittal document on cream-colored stationery that served as a cover sheet for drawings of the equipment's layout at the plant. Ct. Trial Tr. 24-24, 50-53.  These drawings for the plant layout were delivered in person. Ct. Trial Tr. 53.  No one mentioned terms affecting the sale being on the flip side of the cover sheet for the drawings. Ct. Trial Tr. 50-53.  Dakota Foundry did not turn over the transmittal page, was not told by Tromley that it was adding standard terms and conditions at that time, and were not noticed by Dakota Foundry until after the lawsuit started. Ct. Trial Tr. 24-25, 50-53.

## II. Conclusions of Law and Legal Analysis

### A.  Choice of Law

This Court agrees with the Order and Opinion, Doc. 19, issued by Judge Kornmann and borrows liberally from Judge Kornmann's decision in this Opinion and Order.   Whether there is a binding arbitration agreement is "an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (quoting AT&T Tech., Inc. v. Commc'ns Workers, 475 U.S. 643, 649 (1986)).   In examining whether the parties agreed to arbitrate, courts must ordinarily apply "state-law principles that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995).  Such an analysis in a given situation is a mixed question of law and fact.  Id. at 947-48.  "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary" on the issue of arbitrability. Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2nd Cir. 2003) (citing 9 U.S.C. § 4 (2000)).  Judge Kornmann rightly concluded that there were genuine issues of fact as to whether these parties entered into an arbitration agreement.

8

State law is used to resolve issues of fact and law as to whether both parties agreed to arbitrate. First Options, 514 U.S. at 944.  In order to determine which state's law applies, "[f]ederal courts sitting in diversity apply the choice-of-law rules of the forum state." Cicle v. Chase Bank USA, 583 F.3d 549, 553 (8th Cir. 2009).  In South Dakota, parties may bind themselves to the law of a particular state with a valid choice-of-law clause.  See Dunes Hospitality, L.L.C. v. Country Kitchen Int'l, Inc., 2001 S.D. 36, ¶ 69, 623 N.W.2d 484, 488.

There is a choice of forum clause within the Standard Terms and Conditions of Sale, but Dakota Foundry alleges that those terms never became part of the contract.  South Dakota Codified Laws ("SDCL") § 53-1-4 provides that "[a] contract is to be interpreted according to the law . . . of the place where it is to be performed or, if it does not indicate a place of performance, according to the law . . . where it is made." This contract was to be performed, including delivery and installation mostly in South Dakota. Judge Kornmann determined that South Dakota law applies to the question of whether the Standard Terms and Conditions of Sale became part of the parties' contract, and this Court agrees.

Congress passed the Federal Arbitration Act ("FAA") "to reverse judicial hostility to arbitration agreements and to place arbitration agreements on equal footing with other contracts." Keymer v. Mgmt. Recruiters Int'l, Inc., 169 F.3d 501, 504 (8th Cir. 1999).  The FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (2012); see also SDCL § 21-25A-1 (2010).  The FAA's emphasis on resolving "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration," Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983), does not mean that this Court can bypass the question of whether the parties' contract contains

an arbitration clause. See Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57 (1995). "Thus, a party cannot be forced to submit to arbitration any dispute that he has not agreed to submit." Keymer, 169 F.3d 501, 504 (8th Cir. 1999); see also Volt Info. Sciences, Inc. v. Bd. of Trustees, 489 U.S. 468, 479 (1989) (noting that arbitration agreements are "a matter of consent, not coercion").

## B. Whether Initial Contracts Contained an Arbitration Clause

South Dakota contract formation law requires a meeting of the minds on a set of terms to give rise to a contract. Arrowhead Ridge I, LLC v. Cold Stone Creamery, Inc., 2007 S.D. 38, ¶ 12, 800 N.W.2d 730, 734; see also Vander Heide v. Boke Ranch, Inc., 2007 S.D. 69, ¶ 20, 736 N.W.2d 824, 832. The question of mutual consent is determined by considering the parties' actions, as well as their words. In re Estate of Neiswender, 2003 S.D. 50, ¶ 20, 660 N.W.2d 249, 253. "An offeree that takes the benefit of services offered is bound by the terms of the offer if the offeree had a reasonable opportunity to reject them." Masteller v. Champion Home Builders Co., 2006 S.D. 90, ¶ 15, 723 N.W.2d 561, 565 (quoting E. Allen Farnsworth. Contracts § 3.15 at 156 (2d ed. 1990)). At the evidentiary hearing, Tromley acknowledged that it had the burden, by a preponderance of the evidence, to show that the Standard Terms and Conditions of Sale were part of the parties' contract. Ct. Trial Tr. 6; see also SDCL § 53-3-3; Schwartz v. Comcast Corp., 256 Fed. App'x 515, 519 (3rd Cir. 2007) (noting that the "party seeking arbitration, bears the burden of showing a valid agreement to arbitrate"). The key question is whether Dakota Foundry accepted an offer from Tromley or agreed to an amendment to a contract that included the Standard Terms and Conditions of Sale and the arbitration clause therein.

Tromley's initial offer was through quotes in December of 2009 numbered KFP-01228-1 and KFP-01248. Those quotes contained "NOTES" which referred to "the attached copy of our Standard Terms and Conditions of Sale" as "an integral part of this quotation." Ex. 32; Ex. 33. However, those quotations

attached "STANDARD PAYMENT TERMS" and did not attach or include Standard Terms and Conditions

of Sale. Dakota Foundry accepted the offers contained in quotes numbered KFP-01228-1 and KFP-01248,

which did not have the Standard Terms and Conditions of Sale attached, by issuing a single purchase order

in the amount of $564,500 on February 24, 2010. Ex. 3. Tromley issued an invoice on February 24, 2010,

charging a forty percent down payment, without terms and conditions. Thus, Dakota Foundry accepted the

terms and conditions of this offer, which did not have the arbitration clause attached. See Masteller, 2006

S.D. 90, ¶¶ 13-15, 723 N.W.2d at 565. Dakota Foundry also did not have a "reasonable opportunity to

reject" the Standard Terms and Conditions of Sale and the arbitration clause therein in December 2009 as

it was not aware of the clause. See id.; see also U.S. for use of Lighting & Power Servs., Inc. v. Interface

Const. Corp., 553 F.3d 1150, 1155 (8th Cir. 2009) (applying Missouri law and refusing to enforce an

arbitration provision the Defendant attempted to incorporate into a contract by referencing an "attached"

document that, in fact, was not attached). Thus, the initial contract between the parties formed without

mutual consent to any arbitration clause.

   After the initial contract and after Dakota Foundry had paid $225,815, Tromley on April 10, 2010,

issued quotation KFP-01228-2, which stated that it was a "revised quotation" having combined the prior

two quotes and incorporating "all subsequent changes made during our meetings into one cohesive system

quote." Ex. 6. Tromley has not shown by a preponderance of the evidence that the cream-colored original

of this revised quote containing the Standard Terms and Conditions of Sale was provided to Dakota

Foundry with quotation KFP-01228-2. Rather, the testimony of Doug Valsvig, though perhaps naive in

believing that the reference in the quotes to attached Standard Terms and Conditions of Sale meant the

"STANDARD PAYMENT TERMS," is credible in light of the fact that the standard payment terms were

what actually accompanied the "NOTES" and quotations. The testimony on which Tromley relies, from its

salesman Wilson, is less reliable on this point. Wilson stated that he recalled hand-delivering an original

quotation with the Standard Terms and Conditions of Sale to Dakota Foundry because he received a speeding ticket on the way back to the Kloster Division of Tromley in Brown County. He appears to be mistaken about receiving a speeding ticket as neither Brown County in South Dakota nor Brown County in Minnesota have a record of a ticket and neither is on the way between Dakota Foundry and Wilson's home office at the time. Oakvik's testimony that his practice to give Wilson both the original and the working copies does not establish Wilson in fact delivered the original quote, as opposed to a photocopied working copy without the Standard Terms and Conditions of Sale, to Dakota Foundry.

Dakota Foundry did not issue another purchase order formally accepting the revised quote, but its conduct reveals consent to and acceptance of the revised quote. For instance, Dakota Foundry paid additional invoices after receiving the revised quote and accepted the delivery and installation of equipment listed in the quote. Ex. 37; Ex. 38. Thus, the revised quote represents an agreement between the parties, but lacks mutual consent to an arbitration agreement.

As Judge Kornmann noted, this case bears similarities to Masteller, 2006 S.D. 90, 723 N.W.2d 561. In that case, Masteller bought a home manufactured by Champion. The purchase agreement contained warranties but no reference to an arbitration clause. After the home was installed, Masteller received Champion's "Homeowner's Guide, Limited Warranty and Arbitration Agreement," which he summarily signed. Later, Masteller repeatedly called upon Champion to perform work on his home in accordance with the warranty. Masteller then sued, contending that the home had defects at the time of delivery which Champion failed to remedy. Id. at ¶ 2, 723 N.W.2d at 562. Champion brought a motion to compel arbitration, contending that the Mastellers not only signed the Homeowner's Guide, but also reaped the benefits of the warranty contained therein, and thus should be bound to its burdens as well. Id. at ¶¶ 4-5, 723 N.W.2d at 562-63. Noting that Masteller cited the warranty found in the original agreement as the sole basis for the claims of breach of implied and express warranties and that the purchase agreement lacked

12

any reference to arbitration, the Supreme Court of South Dakota affirmed the trial court's denial of Champion's motion to compel arbitration. Id. ¶¶ 16-17, 723 N.W.2d at 566. Simply put, the benefit relied upon by Masteller did not include the burden of arbitration, even if Masteller subsequently signed a document containing essentially the same warranty with an arbitration clause.

### C. Whether Contract Modification Added an Arbitration Clause

Tromley does not allege that Dakota Foundry signed any subsequent document containing an arbitration clause, but does point to Dakota Foundry's receipt of drawings in May of 2010, with the transmittal being on cream-colored stationery, the reverse side of which contained the Standard Terms and Conditions of Sale. Ct. Trial Tr. 50-53. However, nothing in the drawings conveyed to Dakota Foundry that the quotations were being amended or additional terms were being added to the agreements. As Judge Kornmann concluded, the initial receipt of terms and conditions with a drawing sent after contract formation did not convey "the benefit of delivery and installation of the Kloster system to [Dakota Foundry]." Doc. 19 at 7. Indeed, Dakota Foundry was unaware of those terms and conditions accompanying a May 2010 drawing until after starting this lawsuit, and Tromley did nothing in May of 2010, to call those terms to the attention of Dakota Foundry as some additional contract terms.

The same analysis applies to the June 2010 email attachments. The email messages from Tromley to Dakota Foundry on June 7, June 23, and July 6, 2010, and possibly an attachment to an addendum dated June 10, 2010, included an additional page entitled "DEPENDABLE FOUNDRY EQUIPMENT COMPANY REDFORD-CARVER FOUNDRY PRODUCTS COMPANY STANDARD TERMS AND CONDITIONS OF SALE" that contained an arbitration provision. Ex. 13; Ex. 14; Ex. 15. However, Dakota Foundry had no business with the corporate entities Dependable Foundry Equipment Company or Redford-Carver Foundry Products Company; rather, Dakota Foundry was buying equipment and obtaining

13

services from the Kloster division of Tromley. Two of these emails and accompanying addenda, Exhibits 13 and 14, modify the agreement between the parties and provided Tromley an opportunity to attempt to incorporate the Standard Terms and Conditions of Sale. However, each of those quote revisions stated: "This addendum is bound by the same terms and conditions as contained in the original quotation." Ex. 13; Ex. 14. With that language, Dakota Foundry reasonably could conclude that Terms and Conditions from different companies had been attached by accident to these addenda. As for the other emails, Exhibits 15 and 16, cannot be considered revisions of the quotations that added the arbitration clause. None of these communications suggested that new standard terms and conditions were being incorporated into the prior agreements through quotations accepted by Dakota Foundry in February and April of 2010. Dakota Foundry's claim, like that of Masteller, is not based on any of these documents postdating the formation of the parties' agreement. See Masteller, 2006 S.D. 90, ¶ 13, 723 N.W.2d at 565-66.

As noted above, South Dakota contract formation law requires a meeting of the minds on a set of terms to give rise to a contract. Vander Heide v. Boke Ranch, Inc., 2007 S.D. 69, ¶ 20, 736 N.W.2d 824, 832. Agreement to contract terms requires that "the offeree had a reasonable opportunity to reject them." Masteller, 2006 S.D. 90, ¶ 20, 723 N.W.2d at 565. Here, the initial contract was formed without Standard Terms and Conditions of Sale and the subsequent transmittal letters and emailed addenda did nothing to modify the contract to include the Standard Terms and Conditions of Sale.

Arbitration clauses may be incorporated into a contract by reference. See Halbach v. Great-West Life & Annuity Ins. Co., 561 F.3d 872, 876 (8th Cir. 2009). However, terms incorporated by reference are only valid when it is "clear that the parties to the agreement had knowledge of and assented to the incorporated terms." 11 Williston on Contracts § 30.25. "Notice of incorporated terms is reasonable where, under the particular facts of the case, '[a] reasonably prudent person should have *seen*' them." One Beacon Ins. Co.

14

v. Crowley Marine Servs., Inc., 648 F.3d 258, 268 (5th Cir. 2011) (emphasis added) (citation omitted).

The overriding consideration in "determining the validity of contractual terms . . . is whether *the party to be bound had reasonable notice* of the terms at issue and whether the party manifested assent to those terms." One Beacon Ins., 648 F.3d at 269 (emphasis added). A contract "may incorporate another document if the terms of the incorporated document are known or easily available to the contracting parties." Halbach, 561 F.3d at 876.

> Although neither physical attachment nor specific language is necessary to incorporate a document by reference, the incorporating instrument must clearly evidence an intent that the writing be made part of the contract. When the question of whether another paper or term has been incorporated by reference depends on the "exercise of speculation, surmise and conjecture" the court will refuse to rewrite the contract.

Forge v. Smith, 458 Mich. 198, 207 n.21, 580 N.W.2d 876, 882 (1998) (quoting United California Bank v. Prudential Ins. Co., 140 Ariz. 238, 258, 681 P.2d 390 (1983)); see also Lighting & Power Services., 553 F.3d at 1155 (holding that "an incorporation clause is effective only when the provision to which reference is made has a reasonably clear and ascertainable meaning") (quoting AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 242 F.3d 777, 781 (8th Cir. 2001)).

Dakota Foundry did not receive the Standard Terms and Conditions of Sale with the quotes it accepted and later communications did not provide reasonable notice to Dakota Foundry of such terms and conditions. Dakota Foundry, however, did receive and comply with the "STANDARD PAYMENT TERMS" that were attached. Nothing in the May 2010 drawing or the subsequent email messages and accompanying addenda "clearly evidence an intent that the writing be made part of the contract" previously formed through acceptance of quotations. See Forge, 580 N.W.2d at 881 n.21. As Judge Kornmann noted, a common thread through cases recognizing the ability to incorporate by reference certain provisions is language that directs the offeree to the source of that provision. Doc. 19 at 9. The only reference to the

15

location of the terms and conditions—"attached" on the December 2009 and April 2010 quotations—did not have attached Standard Terms and Conditions of Sale. The subsequent emails and addenda did not alert Dakota Foundry to new terms and conditions of sale, and indeed some referred to the terms and conditions remaining as those from the initial quotations. See Ex. 13 and Ex. 14 (noting that the addenda are bound by the same terms and conditions as the April 2010 quote).

Defendant relies on Huntington Int'l Corp. v. Armstrong World Indus., Inc., 981 F. Supp. 134 (E.D.N.Y. 1997), Manard v. Knology, Inc., No. 410CV15CDL, 2010 WL 2528320 (M.D. Ga. June 18, 2010), and Sony Ericsson Mobile Commc'ns AB v. Delta Electronics (Thailand) Pub. Co. Ltd., No. C091326 MMC, 2009 WL 1011722 (N.D. Cal. Apr. 15, 2009), to support the proposition that Dakota Foundry became bound by the Kloster Division of Tromley's Standard Terms and Conditions of Sale through incorporation by reference when Dakota Foundry signed addenda that had attached to it Standard Terms and Conditions of Sale from Tromley's sister companies or even when Dakota Foundry agreed to the original contract without Standard Terms and Conditions of Sale attached. Doc 38. In each of the cases on which Tromley relies, the plaintiff was either given copies of the defendant's standard terms and conditions at the time of contracting, or directed to a company website where the standard terms and conditions were readily available. Huntington, 981 F. Supp at 135-36; Sony, 2009 WL 1011722, at *4; Manard, 2010 WL 2528320, at *1. Thus, the plaintiff either had actual notice of the terms or the terms were easily accessible to them. Other differences bear mentioning as well. In Huntington and Sony, the parties had been contracting with one another with use of an arbitration clause for a period of years. Huntington, 981 F. Supp at 135-36 (noting that arbitration clauses had been "retained without objection" for years); Sony, 2009 WL 1011722, at *4 fn.8 (noting that the plaintiff was "the world's largest provider of switching power supplies" and that the parties had subjected prior disputes to arbitration). Here, the parties had no history of bargaining and Dakota Foundry did not use Standard Terms and Conditions of Sale and arbitration clauses in its dealings.

16

Here, as noted above, the  Kloster Division of Tromley did not deliver its Standard Terms of Sale when the contract was formed in December of 2009, and has not shown by a preponderance of the evidence that it did so with its consolidated quote in April of 2010.  Tromley did not direct Dakota Foundry to the Standard Terms and Conditions of Sale in a way to ensure Dakota Foundry had reasonable notice of the Terms.  Thus, unlike in the cases relied on by Tromley, Dakota Foundry had no notice of the arbitration clause, nor was it given any means of ascertaining those terms at the contract's inception.

## III. Conclusion

For the reasons contained in this Opinion and Order, it is hereby

ORDERED that Defendant's Motion to Compel Arbitration and to Dismiss, or, Alternatively, Stay Proceedings Pending Arbitration (Doc. 9) is denied.

Dated August 29, 2012.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

17